CERTIFIED COPY

A True Copy
Teste:



Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

—————————————

No. 13-3837

KEVIN B. DUFF, as Receiver for
Central Sleep Diagnostics, LLC,

*Plaintiff-Appellee,*

*v.*

CENTRAL SLEEP DIAGNOSTICS, LLC, *et al.,*

*Defendants.*

APPEAL OF: GOODMAN TOVROV HARDY & JOHNSON LLC

—————————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 6162 — **Rebecca R. Pallmeyer**, *Judge.*

—————————————

ARGUED SEPTEMBER 15, 2014 — DECIDED SEPTEMBER 10, 2015

—————————————

Before FLAUM, KANNE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* At the request of defrauded investors
and creditors, a district judge ordered Central Sleep Diag-
nostics, LLC, into receivership in November 2010 and issued
a stay against "all civil legal proceedings of any nature"
involving Central Sleep, its promoter Kenneth Dachman, his

wife, and the other defendants in the underlying fraud case. The receivership was closed in December 2013, and the victims received pennies on the dollar for their claims.

Adam Goodman was a former attorney for Central Sleep and one of its creditors based on an unpaid bill for legal services. Early in the federal proceedings, Goodman correctly anticipated that the receivership would be unable to pay claims in full, so he attempted to outmaneuver the receiver. He obtained a judgment for the unpaid fees and submitted a claim to the receiver. But he also filed a lien against the proceeds of a medical-malpractice lawsuit the Dachmans had filed in state court. Both the lawsuit and the lien flagrantly violated the district judge's stay order. Neither Goodman nor the Dachmans informed the receiver or the judge of these developments.

That's not all. The receiver eventually learned of the medical-malpractice suit and recovered the settlement proceeds for the receivership estate. When the receiver later proposed a plan of distribution, Goodman objected. He argued that his lien entitled him to be paid in full directly from the proceeds of the medical-malpractice suit, rather than pro rata from the receivership estate like the other creditors. The judge rejected this argument but offered Goodman the opportunity to post a supersedeas bond to delay distribution of the receivership estate pending appeal, should he wish to seek review of her decision. Goodman did not post a bond. The judge approved the receiver's distribution plan and the funds were distributed.

With the receivership estate now fully distributed and the receivership closed, Goodman asks us to overturn the judge's approval of the plan and reopen the receivership to

permit him to recover the full amount of his claim. We decline this request, affirm the district court's order, and grant the receiver's motion for sanctions against Goodman and his law firm under Rule 38 of the Federal Rules of Appellate Procedure.

## I. Background

On August 31, 2010, investors in Central Sleep filed suit in Cook County Circuit Court against the company; Kenneth Dachman, its promoter; Dachman's wife, Katherine Lynn Dachman; and several others. The suit asserted claims for fraud, RICO violations, conversion, fraudulent conveyance, civil conspiracy, and securities fraud. Dachman was also criminally charged and convicted for his fraudulent conduct. *See United States v. Dachman*, 743 F.3d 254 (7th Cir. 2014) (affirming a 120-month prison sentence against Kenneth Dachman for related wire-fraud convictions). He spent the funds he stole from investors on "a tattoo parlor; family vacations and cruises to Italy, Nevada, Florida, and Alaska; a new Land Rover; rare books; and to fund personal stock trading and gambling." *Id.* at 256.

In the civil case, the investors requested equitable relief, including disgorgement of profits and the appointment of a receiver to marshal the company's remaining assets, collect amounts owed to it, and distribute the proceeds. Goodman and his law firm, the adverse claimant-appellant in this case, represented the defendants and removed the case to federal

court.[1] The defendants fired Goodman soon after, but not before racking up a $28,205.36 bill for legal services.

On November 1, 2010, the district judge appointed James E. Sullivan as receiver for Central Sleep. Along with other creditors, Goodman received notice of the receivership. Several months later, in March 2011, Goodman sued the defendants in Cook County Circuit Court for his unpaid legal fees. Kevin B. Duff, the appellee in this case, succeeded Sullivan as receiver.

On June 16, 2011, the district judge entered an order staying *nunc pro tunc* from October 18, 2010, "[a]ll civil legal proceedings of any nature, including, but not limited to … actions of any nature involving … (c) any of the [d]efendants." Soon thereafter the judge entered summary judgment for the plaintiffs and awarded $2.5 million in damages.

The defendants did not appear in Goodman's state-court suit for unpaid legal fees, so on August 22, 2011, Goodman moved for default judgment. He then sought limited relief from the district court's stay order, claiming that he had been unaware of it until after he filed the default-judgment motion when he was contacted by the receiver's attorney. Goodman's motion stated that he intended "to obtain judgment and begin garnishment proceedings" because "[p]resumably, some or all of the six individual defendants are gainfully employed." The receiver and the plaintiffs' attorney both opposed the motion. On September 6, 2011,

---

[1] Goodman Law Offices LLC is now known as Goodman Tovrov Hardy & Johnson LLC. For simplicity, we refer to Goodman personally throughout this opinion.

the judge entered an order granting limited relief from the stay: "Motion for limited relief from [the stay order] granted without prejudice to objections, if any, that may be asserted should movant succeed in recovering money from Mr. Dachman and his co-[d]efendants."

On September 11, 2011, Goodman obtained a default judgment against Central Sleep Diagnostics for $28,205.36, along with an assessment of $394 in costs. On March 14, 2012, he obtained default judgments against the individual defendants for $28,205.36 plus $1,282.14 in costs (with an additional $2,100 against Katherine Dachman).

In September 2012 Goodman filed a claim with the receiver for these amounts plus postjudgment interest, along with a claim-verification form. The form, signed by Goodman, stated in part:

> Claimant/creditor acknowledges and agrees that by submitting this claim verification form, claimant/creditor subjects his/her/its claim to the jurisdiction of the U.S. District Court for the Northern District of Illinois, Eastern Division, which is administering the Receivership Estate ("Receivership Court"). Claimant/creditor further agrees that his/her/its claim shall be adjudicated, determined and paid as ordered by the Receivership Court. Claimant/creditor further consents to, and understands that the Receivership Court will determine: (i) his/her/its right to any money from the Receivership Estate, if any is available; (ii) the priority of his/her/its claim; (iii) the scheduling and allocation of any assets to be distributed;

and (iv) all objections and disputes regarding
the allowance of his/her/its claim by the Re-
ceiver, which shall be submitted to and subject
to review by the Receivership Court for a final
ruling without a jury.

Around the same time, Goodman learned that the
Dachmans had filed a medical-malpractice lawsuit in Cook
County Circuit Court against a physician and his medical
practice. That suit—captioned *Dachman v. Buyer*, 2012 L
004568—was filed by a different law firm with no connection
to Goodman (as far as we can tell). The receiver and the
district judge were completely unaware that the Dachmans
had filed this action, which was a flagrant violation of the
stay order. Goodman didn't tell them either.

Instead, on November 5, 2012, Goodman filed a lien in
the *Buyer* case against the Dachmans' interest in any judg-
ment proceeds. This too violated the district court's stay
order. After securing the lien, Goodman sought to improve
his odds of recovery by asking another state judge to declare
the judgment lien "spread of record."[2] That order issued on
December 4, 2012.

On July 22, 2013, the *Buyer* case settled for $305,000. The
receiver learned of the suit and settlement about a week
later, before any money was distributed to Goodman or the

---

[2] In Illinois this procedure allows a judgment-lien creditor to perfect a
lien against a judgment. Having a judgment lien "spread of record" can
obligate defendants to pay the judgment creditor directly for amounts
the plaintiff owes the creditor, ahead of any payments to the plaintiffs
under a judgment or settlement. *See Podvinec v. Popov*, 658 N.E.2d 433 (Ill.
1995).

No. 13-3837                                            7

Dachmans. He filed an emergency request with the district court to freeze the settlement funds and impose a judicial lien. On July 30 the judge ordered a temporary freeze of the settlement proceeds. Two weeks later she granted the receiver's request to impose a lien and directed the Dachmans' medical-malpractice firm to place the $305,000 settlement proceeds in the receiver's trust account. The firm complied, though it later received a portion of the settlement as legal fees.

On September 6, 2013, the receiver filed a plan of distribution proposing a pro rata payout of the receivership estate, after legal and accounting fees. The plan included the *Buyer* settlement proceeds in the receivership estate; indeed, the settlement was the largest asset in the estate. As relevant to this appeal, the plan also excluded interest, court costs, and collection-related attorney's fees from the claim calculations. The claimants were identified by number in the public record to protect their privacy; the receiver submitted their names to the court in camera.

Goodman opposed the receiver's plan of distribution, arguing that his lien entitled him to recover his entire claim amount, plus court costs and interest, directly from the *Buyer* settlement, ahead of all other claimants. He also objected to keeping the identity of the other claimants confidential. The judge rejected these arguments, and on October 24, 2013, denied Goodman's motion to hold back funds from the distribution pending an appeal. She set a supersedeas bond of $250,000 "[s]hould Mr. Goodman file an appeal."

Goodman never posted the $250,000 supersedeas bond. On November 19, 2013, the judge approved the receiver's amended distribution plan, which listed a total receivership

estate of $403,882.68. The judge explicitly found that the *Buyer* proceeds were properly part of the receivership estate and that Goodman had no greater right of recovery than any other creditor. In the weeks that followed, the estate was fully distributed. Goodman received his pro rata share: $1,733.50. In the meantime, he filed a notice of appeal. The receivership was formally terminated on December 31, 2013.

## II. Discussion

Goodman argues that the district court erred (1) by disregarding his "perfected lien" against the *Buyer* settlement proceeds, and (2) by approving a distribution plan that "crammed down" his claim (that is, excluded postjudgment interest and costs) and omitted the names of the other claimants from the public record. The receiver responds that the distribution of the entirety of the receivership estate moots Goodman's appeal and that, in any case, the appeal is frivolous. By separate motion he asks for sanctions against Goodman under Rule 38 of the Federal Rules of Appellate Procedure.

### A. Mootness

The receiver argues that the distribution of all the receivership assets moots Goodman's appeal. The appeal is not moot in the constitutional sense. Goodman asks us to reverse the district court's order approving the plan and to reopen the receivership. If we were to agree, Goodman might ask the district court to exercise "equitable powers to recover erroneous distributions." *In re Vlasek*, 325 F.3d 955, 962 (7th Cir. 2003). The district court also would have the power

(though certainly not the obligation) to allow Goodman to sue the receiver personally for making an illegal distribution. *Cf. In re Linton*, 136 F.3d 544, 545 (7th Cir. 1998) (upholding a bankruptcy judge's denial of leave to sue a bankruptcy trustee, while recognizing that "[t]he trustee in bankruptcy is a statutory successor to the equity receiver, and it ha[s] long been established that a receiver could not be sued without leave of the court that appointed him"). In short, Goodman has a personal stake in the outcome and at least some arguably available remedial options to maintain a justiciable claim under Article III of the Constitution. *See Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1528 (2013) (internal quotation marks omitted).

The receiver also invokes another doctrine, sometimes confused with constitutional mootness, known as "equitable mootness." This doctrine "essentially derives from the principle that in formulating equitable relief[,] a court must consider the effects of the relief on innocent third parties." *SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 331 (7th Cir. 2010) (quotation marks omitted); *accord United States v. Segal*, 432 F.3d 767, 773–74 (7th Cir. 2005); *SEC v. Wozniak*, 33 F.3d 13, 15 (7th Cir. 1994), *overruled on other grounds by SEC v. Enter. Trust Co.*, 559 F.3d 649 (7th Cir. 2009). An appellate court may properly refuse to decide the merits of a challenge to a bankruptcy or receivership plan where unwinding the plan (even if legally justifiable) would be difficult and inequitable in light of the complexity of the transactions and the reliance interests involved. This is not "real mootness"; the court has jurisdiction to alter the outcome, but equitable considerations make it unfair or impracticable to intervene. *See In re UNR Indus.*, 20 F.3d 766, 769 (7th Cir. 1994) (distin-

guishing the concept of equitable mootness from "real mootness").

In evaluating the receiver's argument for equitable mootness, the two key factors are "(1) the legitimate expectations engendered by the plan; and (2) the difficulty of reversing the consummated transactions." *Wealth Mgmt.*, 628 F.3d at 332. This fact-intensive inquiry weighs "the virtues of finality, the passage of time, whether the plan has been implemented and whether it has been substantially consummated, and whether there has been a comprehensive change in circumstances." *Segal*, 432 F.3d at 774 (citing cases) (quotation marks omitted).

The reliance interests of the other claimants in this case seem quite significant. We cannot say with certainty *how* significant because the extent of their reliance is partly a function of their current personal circumstances, which the record before us does not disclose. *See, e.g.*, *In re Envirodyne Indus.*, 29 F.3d 301, 304 (7th Cir. 1994) (noting an insufficient record on "whether modification of the plan … would bear unduly on the innocent"). We know that some of the claimants are elderly, and many were very badly harmed by Dachman's fraud. They received about six cents for every dollar of their approved claims against Central Sleep. The investor with the greatest loss, whose claim of $625,000 was approved by the receiver, recovered only around $38,000 from the estate. A clawback for Goodman would cost the others more than 10% of their already meager recovery.

The other claimants also have a right to expect to keep what they received. The plan has been not only "substantially consummated," *Segal*, 432 F.3d at 774, but *fully* consummated, and the receivership is now closed. The claimants

No. 13-3837                                                          11

know that Goodman never posted a supersedeas bond after his arguments failed and his request for a holdback was rejected by the district court. And as far as we can tell, the other claimants (unlike Goodman) did not try to impede the receivership. The "legitimate expectations engendered by the plan" weigh against our consideration of Goodman's appeal. *Wealth Mgmt.*, 628 F.3d at 332.

The difficulty of undoing the transaction is a closer call. In some respects this plan may be simpler to unwind than others this court has seen. Most importantly, this plan involved distribution of cash, which is easy to count and value, unlike stock distributions or asset sales. *Cf. Segal*, 432 F.3d at 774 (sale of a former business, with consequences for employees and competitors); *In re Envirodyne Indus.*, 29 F.3d at 304 (distributions of stock, some of which were already sold); *In re UNR Indus.*, 20 F.3d at 769 (stock sale). Because there is nothing left of Central Sleep, there are no investors in a reorganized business whose interests would be negatively affected. So there is less risk that in future receivership proceedings similarly placed investors will underpay for receivership assets out of concern that further litigation may reduce asset value. *Cf. In re UNR Indus.*, 20 F.3d at 770.

In addition, the number of claimants, the sum of money at stake, and the size of the distribution plan are all relatively small. Goodman would seek to claw back from the 50 other claimants approximately $30,000, minus the $1,700 he has already recovered. The claimants received total distributions that add up to about $243,000. *Cf. Wealth Mgmt.*, 628 F.3d at 332 ($4.2 million was already distributed to 300 investor-claimants); *In re Envirodyne Indus.*, 29 F.3d at 303 ($141

million in stock was already distributed to noteholders); *In re UNR Indus.*, 20 F.3d at 769 (15 million shares of stock traded in public markets were already distributed). If he were successful on appeal, Goodman could seek about $8,400 total from the two claimants with the largest distributions; the remaining $19,900 would have to come from everyone else—an average of around $400 per claimant.

But when we consider the difficulty of unwinding the receivership distribution in an equitable sense, we are mindful of the cumulative practical costs this choice would impose on the participants in the plan. When recovery amounts get *this* small—an average of $400 each from most of the claimants—there is a real possibility that the net social value of a partial do-over would be negative. A claimant who prevails on appeal doesn't internalize the costs that his efforts to claw back distributions would impose on everyone else, so we cannot simply rely on Goodman to stop collecting when the total costs exceed the remaining potential recovery. (This point is reinforced by Goodman's litigation behavior to date.) So while in some cases smaller sums of money and fewer participants in a receivership plan could lessen the reviewing court's practical concerns, here the difficulty of reversing this transaction—from equitable *and* practical perspectives—tips in favor of preserving the status quo.

Because Goodman's appeal is patently frivolous on the merits, however, we need not come to a firm conclusion about equitable mootness. *See Wealth Mgmt.*, 628 F.3d at 332 (concluding that "we need not take the analysis any further" because the district court's decision was being affirmed on the merits); *Segal*, 432 F.3d at 774 (deciding that the difficulty

in "determin[ing] the precise effects" of trying to unwind the settlement "prevents us from conclusively holding … that it would be foolish for us to even consider reversing the deal"); *In re Envirodyne Indus.*, 29 F.3d at 304 (stating that if there were doubts about the lack of merit to the appellant's argument, the court would remand the case to the district court to determine the effect of modifying the plan on the other participants). We therefore proceed to the merits of Goodman's claims.

## B. The Merits

### 1. *The "Perfected Lien" Claim*

Because the district court has "broad equitable power in this area," we review the court's decision approving the distribution plan deferentially, for abuse of discretion. *Wealth Mgmt.*, 628 F.3d at 332. Goodman argues that the judge erred in rejecting his claim to preferential treatment based on his "perfected lien" against the settlement proceeds in the Dachmans' medical-malpractice case. He boasts that he "found the medical malpractice case about nine months before Mr. Duff did, and perfected a security interest in it long before Mr. Duff was even aware that the case existed."

As legal support for this argument, Goodman relies largely on the Full Faith and Credit Act, which requires federal courts to give the judicial acts of the states "the same full faith and credit … as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." 28 U.S.C. § 1738. Goodman contends that the district court violated the Act by failing to recognize and accord priority to his state-court lien.

The first obvious problem with Goodman's argument is that the Full Faith and Credit Act does not apply when the claim or issue before a federal court was never actually decided in state court. Applying the Full Faith and Credit Act requires "tak[ing] up the question: What matters did the [state-court judgment] legitimately conclude?" *Baker by Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 237 (1998). Here, there is no state-court judgment addressing the relative priority of Goodman's claim to the *Buyer* settlement proceeds as against the receiver's. The state court's order spreading the lien of record meant only that Goodman should have priority over the *plaintiffs* in the case—that is, the Dachmans. The state court never considered, much less decided, whether Goodman or the receiver would have priority. How could it? Goodman never informed the state judge of the receivership, nor did he give the receiver notice of the state proceedings.

The district judge therefore had no need to address the validity of Goodman's lien when deciding that the *Buyer* proceeds belonged to the receivership estate; it was sufficient that the receiver had a superior claim. And the receiver's claim was properly prioritized over Goodman's later "perfected lien." Receivers can displace even *prior* security interests in receivership property in some circumstances. *See, e.g.*, *Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir. 1994) (prioritizing a receiver's lien for fees over a preexisting mortgage where the mortgagee acquiesced in the receivership). A receivership court can certainly use its equitable powers to give the receiver's judgment priority over a state-court lien obtained by a claimant *subsequent to* that judgment.

In any event, because Goodman obtained the lien in violation of the district court's order, the judge could simply disregard the lien. This is the second glaring problem with Goodman's argument. In her September 2011 order, the judge lifted the stay for a narrowly limited purpose. Goodman was permitted to obtain a state-court judgment and perhaps garnish the defendants' wages, *subject to objections by the receiver*. Because Goodman's motion to lift the stay did not request permission to pursue any collection actions beyond this, the federal stay remained in effect with respect to other potential sources of recovery, including the proceeds of the *Buyer* case. And the September 2011 order partially lifting the stay was specifically conditioned on the receiver's right to object to Goodman's efforts in state court; under no reading of that order was Goodman authorized to perfect a lien against the *Buyer* proceeds without giving the receiver notice and an opportunity to object.

The Full Faith and Credit Act directs courts to apply the "law or usage in the courts" of the rendering state in analyzing the preclusive effect of state-court judgments. 28 U.S.C. § 1738; *see also Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985); *Czarniecki v. City of Chicago*, 633 F.3d 545, 548 n.3 (7th Cir. 2011). Illinois courts do not enforce liens obtained in violation of a federal stay. *See, e.g., Cohen v. Salata*, 709 N.E.2d 668, 672 (Ill. App. Ct. 1999) (vacating a lower-court order after deciding that a bankruptcy automatic stay order had deprived the state court of subject-matter jurisdiction over the claim in the first place). Goodman does not argue otherwise; instead he maintains that he never violated the stay in obtaining or perfecting the lien. For the reasons we've already explained, that claim cannot be taken seriously.

Goodman also altogether ignores the fact that the malpractice case *itself* was from beginning to end conducted by the Dachmans in violation of the federal stay. We could easily affirm on this basis too. A state-court action that violates a federal stay order is voidable in federal court, if not void *ab initio*. *See Middle Tenn. News Co. v. Charnel of Cincinnati, Inc.*, 250 F.3d 1077, 1082 n.6 (7th Cir. 2001) (acknowledging debate between circuits over whether actions taken in violation of a bankruptcy automatic stay order "are void or merely voidable"); *accord Kimbrell v. Brown*, 651 F.3d 752, 755 (7th Cir. 2011). Irrespective of Goodman's own violation of the stay order, the Dachmans' violation of the stay brought the proceeds of that action properly within the discretion of the receivership court.

Because Goodman has given us no nonfrivolous argument to support his claim that the district court erred in disregarding his "perfected lien," we will not disturb the court's reasonable inclusion of the entire *Buyer* settlement in the receivership estate without regard to the lien.

### 2. *Other Challenges to the Plan of Distribution*

Goodman raises two additional challenges to the judge's approval of the receiver's distribution plan. First, he argues that the judge erred in approving a plan that "crammed down" his claim by excluding postjudgment interest and court costs. Second, he argues that the decision to keep the claimants' identities out of the public record was improper. These claims are equally flimsy.

Goodman asserts that because his state-court default judgment against Central Sleep awarded court costs and

Illinois law allows postjudgment interest, 735 ILL. COMP. STAT. 5/2-1303, those amounts must be recognized as part of his claim in the receivership proceedings. Again he relies on the Full Faith and Credit Act, but he makes a number of obvious errors in his analysis. For starters, the district judge never questioned either the validity of the state-court judgment or its amount. And Goodman continues to overlook the fact that his ability to execute on his state-court judgment was strictly limited by the terms of the district judge's September 2011 order granting relief from the stay and his consent to the equitable jurisdiction of the receivership court. To repeat: the judge's order granted Goodman limited relief from the stay *subject to objections by the receiver*. The receiver's proposed plan of distribution disallowed, as a matter of equity, Goodman's claim of entitlement to court costs and postjudgment interest, something other claimants could not receive. The judge was entitled to agree.

Goodman hasn't explained how the judge otherwise abused her discretion. His inability to do so is no surprise; the judge's approval of the plan was clearly correct. The exclusion of this small portion of Goodman's claim was entirely appropriate because many claimants were prevented by the district court's stay order from filing state-court actions. Other claimants had filed the receivership action in the first place and also could not separately pursue their claims in state court. To treat the claimants equally across the board, the final distribution plan reasonably excluded claim amounts attributable to penalties, interest, and attorney's fees.

Goodman's argument with respect to the confidentiality of claimants' identities fares no better. A district court's

decision to keep a *litigant's* name confidential is reviewed for abuse of discretion. *Doe v. Elmbrook Sch. Dist.*, 658 F.3d 710, 721–24 (7th Cir. 2011), *reversed on other grounds en banc*, 687 F.3d 840, 842–43 (7th Cir. 2012) (adopting the panel's analysis on anonymity). We are *at least* as deferential to a decision to keep other aspects of the record under seal. Goodman mounts only a feeble challenge to the judge's decision, citing a single case, *Mueller v. Raemisch*, 740 F.3d 1128 (7th Cir. 2014), and relying on generalized references to bankruptcy-court practice. Neither *Mueller* nor general bankruptcy practice helps him here.

While secrecy in judicial proceedings is generally disfavored (as we made clear in *Mueller*, *see* 740 F.3d at 1135–36), Goodman makes no effort to explain why the limited confidentiality allowed here is not appropriate in the context of this receivership. Indeed, the *litigants'* names are public. Goodman insists that the names of all the other *claimants*—the *victims* of Dachman's fraud—be made public. To the extent that this argument relies on *Mueller*, that case is not even remotely analogous. In *Mueller* we criticized a decision to allow sex-offender plaintiffs to litigate anonymously in a constitutional challenge to a state sex-offender registration law. Our criticism was largely premised on the fact that their status as sex offenders was already a matter of public record; we also noted they were *perpetrators*, not *victims*. *See id.* It should be self-evident that this reasoning does not apply here.

Goodman also seeks support from general bankruptcy practice, but the Bankruptcy Code specifically provides that "a paper filed in a case under this title … [is a] public record" subject to limited exceptions. 11 U.S.C. § 107(a). A

No. 13-3837                                                    19

federal receivership is not governed by the Bankruptcy Code. Goodman has not explained why a receivership court's broad discretion does not include the discretion to treat as confidential the names of the claimants. Nor has he given us any reason to think that the judge abused her discretion here.

### C. Rule 38 Sanctions

Rule 38 of the Federal Rules of Appellate Procedure allows us to "award just damages and single or double costs" when an appeal is frivolous. Rule 38 sanctions compensate the aggrieved party and deter future frivolous appeals. *McCoy v. Iberdrola Renewables, Inc.*, 769 F.3d 535, 536–37 (7th Cir. 2014). An appeal is frivolous "when the result is obvious or when the appellant's argument is wholly without merit." *Id.* at 538. Sanctions may also be appropriate if an appeal is filed for an inappropriate purpose, *In re Hendrix*, 986 F.2d 195, 201 (7th Cir. 1993), or if the arguments made are merely cursory, *Clark v. Runyon*, 116 F.3d 275, 279 (7th Cir. 1997). We do not impose Rule 38 sanctions lightly, however. Reasonable lawyers often disagree, and "this court's doors are open to consider those disagreements brought to us in good faith." *Harris N.A. v. Hershey*, 711 F.3d 794, 801 (7th Cir. 2013).

Rule 38 requires either notice from the court or a separate motion by the appellee, and a reasonable opportunity to respond. The receiver filed a separate Rule 38 motion and Goodman has responded. In light of the record and Goodman's oral argument, we conclude that the appeal is both frivolous and deserving of sanction.

As we've explained, much of Goodman's briefing is based on his obvious misunderstanding of the Full Faith and Credit Act. We're particularly troubled, however, by Goodman's inexplicable insistence that he owed no duty to keep the district judge or the receiver informed of his activities in state court. We emphasize again that the judge granted only limited relief from the stay for Goodman to obtain a judgment and garnish wages, and this limited relief was explicitly conditioned on the receiver's right to object. As an officer of the court, Goodman surely understood his obligation to respect this order. Instead he ignored it, and he advances an argument that would have us treat its limitations as meaningless.

Goodman's challenge to the confidentiality of the claimants' identities is just as problematic. He argued in his principal brief that the receiver implemented a "secret claims-handling process" in which even the district judge herself was denied access to the claimants' identities. That is false. If he had simply read the receiver's explanation of the distribution plan, he would have known that the receiver submitted the claimants' identities to the district court in camera. The receiver noted Goodman's error in his response brief. To his credit, in his reply brief Goodman retracted this wild and unfounded argument. But that doesn't make up for his lack of care in the first place. And as we've noted, his legal authority for this claim is woefully inadequate.

These are indications that Goodman's appeal was not only frivolous but egregiously so. There are compelling indications of lack of diligence or, just as likely, outright bad faith. Goodman's failure to post a supersedeas bond pursuant to the district court's order ensured that the receivership funds

No. 13-3837                                                    21

were fully distributed by the time the case reached us.
Goodman's insistence on pursuing this appeal thus put the
receiver to needless personal expense. Because the receiver-
ship estate no longer contains any assets, Duff's counsel was
forced to defend the appeal pro bono.

This discussion leaves little doubt that Goodman's appeal
is frivolous and sanctionable under Rule 38. The receiver
may submit, within 28 days of the issuance of this opinion,
an affidavit and supporting papers specifying his damages
from this frivolous appeal. Goodman may file a response not
later than 28 days of the receiver's submission.

AFFIRMED; SANCTIONS ORDERED.